RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800
Dennis J. O'Grady (DJO 7430)

WEIL, GOTSHAL & MANGES LLP
 767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Martin J. Bienenstock, Esq. (MJB 3001)
Kathryn L. Turner, Esq. (KLT 8555)

Co-Attorneys for the Debtors

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br> G-I HOLDINGS, et al.,<br><br>                    Debtors. | In Proceedings for Reorganization Under Chapter 11<br><br>Case Nos. 01-30135 (RG) and 01-38790(RG) Jointly Administered |
| G-I HOLDINGS, INC.,<br>                              Plaintiff,<br>v.<br><br>THOSE PARTIES LISTED ON EXHIBIT A, et al.,<br><br>                         Defendants. | Adv. Pro. No. 01-3013 (RG)<br><br><br>**Hearing Date: March 9, 2004 at**<br>**Hearing Time: 11:00 a.m.** |

## REPLY OF G-I HOLDINGS AND BUILDING MATERIALS CORPORATION OF AMERICA TO COMMITTEE'S OBJECTION TO BMCA'S PROPOSED REFINANCING AND MOTION TO MODIFY THE PRELIMINARY INJUNCTION TO OBTAIN AUTHORITY TO PROSECUTE VARIOUS CLAIMS

As and for their reply to the Official Committee of Asbestos Claimants'

(the "Committee") motion (the "Motion") to prevent BMCA from proceeding with its

proposed refinancing and to modify the preliminary injunction to grant the Committee

authority to prosecute various claims, G-I Holdings Inc. ("G-I"), chapter 11 debtor in

possession, and Building Materials Corporation of America ("BMCA") respectfully

represent as follows:

## STATEMENT OF THE CASE

**A.    SUMMARY OF ARGUMENT**

       After the Committee represented its opposition to BMCA's refinancing

would differ from its previous objections overruled by the Bankruptcy Court ruling

affirmed by the District Court, the Bankruptcy Court scheduled the March 9 hearing to

consider the Committee's then unfiled objection.  The Committee brought more than an

objection by way of its Motion which has 3 main parts:

> 1.    The Motion contains no criticism of the commercial terms of the refinancing of BMCA bonds with new BMCA bonds, but warns against allowing BMCA to use its revolving credit line to repay existing notes and requests an injunction against the refinancing pending at least the first 30 days of the actions it requests authority to prosecute;

> 2.    The Motion requests authority for the Committee to prosecute BMCA avoidance actions (having no current existence because BMCA is not a title 11 debtor), similar to its prior unsuccessful request to have the Bankruptcy Court rule what effect refinancing has on those avoidance actions; and

> 3.    The Motion requests authority for the Committee to prosecute a purported fraudulent transfer action of G-I to recover the assets of its own company, BMCA, and then to cause BMCA's secured bondholders to surrender their liens to BMCA.

       By this reply, G-I requests the Court restrict the March 9 hearing to what

the Court scheduled it for, namely, the determination of whether BMCA should be

enjoined from refinancing its public bonds.

Notably, at any time during the last 3 years the Committee could have requested authority to prosecute actions. The Court should not allow the Committee to disrupt an advantageous refinancing by attempting a last second ploy of intermingling it with a brand new motion.

The Court should deny the Committee's request to enjoin BMCA from refinancing its public bonds for the following reasons:

- The Committee has not alleged any commercial reasons for the Court to overrule BMCA's business judgment about the terms of a refinancing negotiated at arms length at the point of historically low interest rates;

- The Committee's challenge to BMCA's use of its revolver to repay bonds prior to issuing new bonds fails because as BMCA's witness testified, BMCA would only use its revolver in a transaction that would not expose BMCA to risks;

- Throughout the G-I chapter 11 case, the Committee has insisted it will achieve retroactive substantive consolidation of BMCA and G-I and will then avoid the value of the liens BMCA granted the bondholders. (See Committee's Supplemental Submission at 16, annexed hereto as Exhibit 1).[1] NOWHERE does the Committee contend it can no longer do that regardless of whether the bonds are refinanced. Moreover, the Committee has actively resisted all G-I's attempts to resolve the Committee's pending motion for substantive consolidation and has even requested a stay of the motion. See Transcript of Proceedings dated September 30, 2003 at 109-112, annexed hereto as Exhibit 2.

- In contradiction of the record, the Committee alleges as the underpinning of its entire Motion that the purpose of the preliminary injunction protecting BMCA was to preserve the status quo as to its potential avoidance actions. In fact, the Court held an emergency hearing to allow the Committee to prove its entitlement to "interim substantive consolidation," knowing that failure to

---

[1] "The Committee has repeatedly articulated throughout this case its objective of …(ii) utilizing BMCA's status as successor to GAF Corporation as the predicate for substantive consolidation of BMCA and G-I *nunc pro tunc* as of the Petition Date."

grant the motion would enable the 90-day preference period to expire. The Court denied the motion, allowed the preference period to expire, and, as shown below, opined numerous times on the purpose of the preliminary injunction without ever mentioning it was to preserve avoidance actions. Moreover, the Court insisted it would not stand in the way of BMCA paying its debts. Indeed, BMCA has been paying its debts for the duration of G-I's chapter 11 case.

- Even if the expiration or mootness of a hypothetical BMCA avoidance action were a ground to enjoin the refinancing, the Committee has failed to state a claim for enjoining the refinancing. In the Committee's Motion, the Committee carefully contends *the indenture trustee contends* the BMCA refinancing will be a defense to an avoidance action to eliminate the BMCA bondholders' liens. Motion at ¶ 27. NOWHERE does the Committee contend the indenture trustee is right. NOWHERE does the Committee allege refinancing would moot the avoidance actions it wants to prosecute. Moreover, the Committee cites no authority showing that avoidance actions disappear after a debt is paid and ignores the jurisprudence (cited below) showing avoidance actions are collectible after payment.

The Committee's requests to prosecute avoidance actions are refuted by the record of the G-I chapter 11 case. Significantly, both requests require that BMCA be brought into bankruptcy, either by taking its assets in a G-I fraudulent transfer action or by deeming it the alter ego of G-I. The Committee's requests fail as a matter of law, but worse yet, are tomfoolery for the following reasons:

Value Destruction. BMCA sells roofing with 20 and 30-year warranties. As BMCA's chief executive testified early in the G-I case, bankruptcy would materially reduce if not destroy BMCA's value because of such factors as customers not buying roofing with warranties from bankrupt companies, alliances with retail outlets would be jeopardized, employees would leave, etc. (See Transcript of Hearing dated March 14, 2001 at 32-37, annexed hereto as Exhibit 3 and Collins' Deposition Transcript at 26-27, 62, 92-93, annexed hereto as Exhibit 4.) The Committee feigns ignorance of these consequences and risks and NOWHERE addresses them. Rather, it assumes the value to be freed up by avoiding liens is greater than any losses. Nothing in the record supports the Committee's premise.

<u>End Round Around the District Court</u>.  Although the Committee fails to disclose it, the Committee brought to the District Court, by reference withdrawal, its request that BMCA be rendered liable for G-I's asbestos claims.  The relief it requests in the actions it seeks to prosecute here creates the same result as the relief the Committee previously opted to seek in the District Court.

<u>Lack of Merit</u>.  G-I owns 100% of BMCA.  NOWHERE does the Committee show why G-I's predecessor's public sale of assets to a wholly-owned subsidiary ten years ago is a fraudulent transfer.  To the contrary, BMCA's chief executive testified as to how BMCA flourished and created value owned by G-I by being separate from G-I.

<u>No Colorable Claim</u>.  The Committee already had an emergency trial in which it tried to consolidate BMCA into G-I and it lost.  Since then, the Committee has resisted any final hearing.  Under these circumstances, the Committee cannot possibly show its claim is even colorable.

<u>Statute of Limitations – Fraudulent Transfer</u>.  BMCA was created in 1994.  None of the statutes of limitation for fraudulent transfers run as long as 10 years.  The Committee's pleadings are consumed with a concatenation of esoteric, theoretic, implausible reasons why the statute of limitations has not run.  The hurdle created by this issue alone renders the action implausible enough that G-I's judgment not to bring it should not be disturbed.

<u>No Recovery under 11 U.S.C. § 550</u>.  The Committee contends that once it shows BMCA's assets should be returned to G-I because they were fraudulently transferred, BMCA's granting of liens to its bondholders can be recovered because the bondholders are mediate transferees of the fraudulent transfers.  Motion at ¶ 33.  NOWHERE does the Committee explain how it overcomes 11 U.S.C. § 550(b)(1) providing G-I cannot recover from a transferee who takes security for an antecedent debt in good faith and without knowledge of the voidability of the transfer avoided.  In December 2000, BMCA's bondholders could not possibly have known the assets G-I's predecessor transferred to BMCA in 1994 while retaining ownership of BMCA were fraudulently transferred.

<u>Standing</u>.  The Committee has no standing to request standing to prosecute BMCA's hypothetical avoidance actions.  The Committee's authorities support G-I.  Alleging BMCA is G-I's alter ego, after losing on that issue at an emergency hearing does not help the Committee's cause.

<u>No Subject Matter Jurisdiction</u>.  For the same reasons the Court denied the Committee's request for declarations about the effects of refinancing on BMCA's hypothetical avoidance actions, the Court lacks subject matter

jurisdiction to allow the Committee to bring those hypothetical avoidance actions.

Finally, the Committee's request for an injunction against BMCA's refinancing while it prosecutes its putative fraudulent transfer actions is directly contrary to the United States Supreme Court's holding in <u>Grupo Mexicano v Alliance Bond Fund</u>, 527 U.S. 308 (1999).  There, bondholders requested an injunction against an entity's use of cash while they pursued their claims.  The Supreme Court ruled federal jurisprudence does not provide that remedy.

## B.    PROCEDURAL HISTORY

<u>Case Commencement.</u>    On January 5, 2001 (the "Commencement Date"), G-I commenced a voluntary case under chapter 11 of the Bankruptcy Code.  On August 3, 2001, G-I's affiliate, ACI commenced a voluntary case under chapter 11 of the Bankruptcy Code.  An order directing the joint administration of G-I and ACI's chapter 11 cases was entered October 10, 2001.  G-I and ACI continue to be authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

<u>Committee Appointment</u>.    On January 18, 2001, the United States trustee appointed a statutory committee of asbestos claimants (the "Committee") in G-I's chapter 11 case.

<u>Substantive Consolidation</u>.    On February 8, 2001, the Committee filed a complaint requesting substantive consolidation (retroactive to January 5, 2001) of BMCA with G-I, or an order compelling G-I to cause BMCA to commence a title 11 case.  <u>See</u> Exhibit 5.

**First Trustee/Receivership Motion**   Simultaneously, the Committee propounded its motion dated February 8, 2001 (the "Trustee Motion") for appointment of a trustee or to allow the Committee to prosecute a state court receivership action against BMCA.  See Exhibit 6.

**Denial of Request for Interim Substantive Consolidation**.  After extensive discovery and a three day evidentiary hearing, this Court issued an opinion denying the Committee's request for interim substantive consolidation.  The Court found that based on the record before it the Committee had not met its burden of making out a case for successor liability or substantive consolidation.  See Official Committee of Asbestos Claimants v. G-I Holdings Inc. (In re G-I Holdings Inc), 2001 WL 1598178 (Bankr. D.N.J. 2001) at Exhibit 7.

**Preliminary Injunction Protecting BMCA.**   On January 8, 2001, G-I filed a complaint seeking a preliminary injunction enjoining the assertion of present and future asbestos claims against BMCA.  See Exhibit 8.  A hearing on G-I's request for a preliminary injunction was held on June 8, 2001.  See June 8, 2001 Hearing Transcript, annexed hereto as Exhibit 9.  On June 22, 2001, the Court orally ruled it would grant the preliminary injunction.  See Exhibit 10.

On February 22, 2002, this Court issued an order granting a preliminary injunction barring the filing or prosecution of present and future asbestos claims against BMCA (the "Preliminary Injunction Order")  See Exhibit 11.  The Preliminary Injunction Order allows BMCA to continue to operate its business in the ordinary course as a non-debtor, but requires BMCA to make certain disclosures and constrains it from carrying out certain specified transactions without first affording the Committee thirty days notice.

It does not prevent the repayment of debt when due nor does it prevent BMCA from proceeding with normal course business transactions.  Indeed, at one of the hearings to consider the terms of the Preliminary Injunction the Committee argued BMCA's should not be able to repay debt (See Transcript of Proceedings dated July 19, 2001, annexed hereto as Exhibit 12, at 48 "We are proposing the construct that old money has to stay in place unless you say it can be repaid, so that we won't completely moot out the issue that we have before you in the substantive consolidation case which is lien avoidance."). Its request was rejected by this Court.  See Transcript of Proceedings dated July 19, 2001, annexed hereto as Exhibit 12, at pp 64-66:

> So if there has been some misapprehension to not have normal course transactions proceed in the normal course, *I know of no authority that would not allow a non-debtor to do business*.
>
> There were other reasons why I imposed the injunction and I hope they are articulated in the reasoning of my opinion, which I don't intend to comment upon or reiterate, nor – and I understand that was imposed over objection of the Committee.  But, in terms of repayment of debt that would normally be repaid, I assume that – I would be hard pressed to stop the repayment of normal debt obligations.  That wasn't ever meant to be an outcome of this injunction proceeding or any conditions pertinent thereto.  Certainly, information should be provided.  But, BMCA has to be able to operate as an ongoing business.  We are not talking about insider transactions or transactions that are generally given greater scrutiny and are suspect, but we are talking about transactions between an arms length party, and subject to reporting requirements of a public company.  Let's put it in proper context because I was never intending to put those kind of scriptures on a non-debtor public company.

**G-I's Declaratory Judgment Action that BMCA has No Successor Liability.**   On February 7, 2001, G-I filed its complaint seeking a declaratory judgment that BMCA has no successor liability for G-I's asbestos claims.  See Exhibit 13.  In an effort to move the complaint forward expeditiously, G-I moved for summary judgment

with respect to its complaint.  <u>See</u> Exhibit 14.  The Committee resisted and insisted on

discovery.  Over 300,000 pages of documents have been produced, 19 depositions taken

and over $5 million in legal fees expended by the Committee and the Legal

Representative alone.

   **<u>Committee Reference Withdrawal Motion</u>**.  On July 1, 2002, the

Committee filed its motion to withdraw the reference with respect to the Declaratory

Judgment Action.   This motion is currently pending before the United States District

Court for New Jersey (the "District Court").  <u>See</u> Exhibit 15.

   **<u>Entry Into the Citibank Facility</u>**.  On March 18, 2003, BMCA provided

the Committee and the Legal Representative with notice of its intention to replace

BMCA's credit agreements with a senior secured revolving credit facility (the "Citibank

Facility") in order to allow it refinance its existing Credit Agreements.  On May 5, 2003,

the Committee, BMCA and the Legal Representative entered into a stipulation (the

"Stipulation") which provided, among other things, that BMCA's entry into the Citibank

Facility would not prejudice the rights, if any, the Committee, the Legal Representative

or the G-I estate may have against the Bank of New York ("BNY") or BMCA's public

bondholders (the "Noteholders").  The Stipulation also provided BMCA would not

commence a repurchase program with respect to BMCA's public notes without first

giving 30 days notice.  The Stipulation does not affect BMCA's right to make, without

notice, payments of bank debt or public notes when due, which BMCA has made.

   **<u>Bank of New York's Objection</u>**.  BNY and Mass Mutual Life Insurance

Company on behalf of the Noteholders filed limited objections to the Stipulation

challenging the Court's jurisdiction to prejudice their rights.  <u>See</u> Exhibit 16.

**The Committee's Objection**.  The Committee responded by filing an objection to BMCA's entry into the Citibank Facility absent a ruling BNY or the Noteholders could not use repayment as a defense to a future action.  See Exhibit 1.

**Denial of Committee's Objection.**  On June 18, 2003, this Court denied the Committee's request to prevent BMCA's entry into the Citibank Facility or to modify the Preliminary Injunction Order to bar BNY or the Noteholders from asserting that the refinancing of BMCA's debt gives rise to new rights or defenses in favor of BNY or the Noteholders that do not otherwise exist under applicable loan documents or existing law.  This Court held the issue of BNY's and the Noteholders' future defenses or rights was not ripe for judicial review and that it lacked subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).  See Transcript of Decision dated June 17, 2003, annexed hereto as Exhibit 17.

**District Court Affirms**.  The Committee appealed this Court's order denying the modification to the District Court.  The District Court affirmed this Court's decision holding the controversy was not ripe for judicial review.  See Decision, dated January 29, 2004, annexed hereto as Exhibit 18; see also Hearing Transcript, dated January 29, 2004, annexed hereto as Exhibit 35.  The Committee has appealed the District Court's decision to the Third Circuit.

**Notice of the Instant Refinancing.**  On January 9, 2004, G-I gave the Committee and the Legal Representative notice of its intent to issue up to $150,000,000 of new senior secured notes and of its intention to use the proceeds to redeem the 8 5/8% Senior Secured Notes due 2006 under the optional redemption provision included in the 2006 Notes (the "Refinancing").  See Exhibit 19.  It also notified the Committee of the

potential of using the funds for an opportunistic open market purchase of the outstanding

BMCA Senior Notes, in compliance with the provisions of the BMCA Credit Agreement

dated July 9, 2003.

On January 26, 2003, G-I and BMCA met with the Committee to discuss

the Refinancing.  The Committee did not question the economic rationale for proceeding

with the transaction and its financial advisor admitted at that time it made economic sense

to proceed.  The Committee, however, voiced concern over the impact the Refinancing

may have on its hypothetical avoidance action against BNY and the Noteholders.  The

Committee's proposed solution, which was untenable to BMCA and G-I as it would

destroy the value of BMCA's business, was to allow the Committee to proceed with

filing a preference action against the 2006 Noteholders and then stay that action until it

succeeded in proving successor liability and in its quest to retroactively substantively

consolidate BMCA and G-I.  G-I and BMCA informed the Committee this would have a

direct negative impact on BMCA's business and therefore they could not consent.  The

Committee indicated it would have to proceed with an objection to preserve its ability to

prosecute its hypothetical avoidance action.

**The Committee Delays**.  At a conference call on February 13, 2004, this

Court set February 26, 2004 at 11 a.m. for a hearing on the Committee's Objection to the

Refinancing.  In order to take advantage of current market conditions, G-I and BMCA

requested a hearing be held at the earliest possible date.[2]  During that call, G-I informed

---

[2]      Using the Citigroup Weekly Single "B" Index, as of February 27 2004, the cost
impact to BMCA of the 1 month delay brought on by the Committee ranges from $5
million to $8 million on a gross incremental Interest Cashflow basis and $3 million to $5
million on a net present value basis.  The volatility of the rates also explains why BMCA

the Committee it might also use the Citibank Facility to redeem some of the 2005 or 2006

Notes prior to issuing the New Notes.  In an attempt to delay the hearing (presumably to

complete its 66 page memorandum of law), the Committee requested additional time to

consider the impact of using the Citibank Facility to redeem some of the 2006 Notes.

The Committee stated a 30(b)(6) deposition was required to consider the impact of using

the Citibank Facility to redeem some of the 2006 Notes.

**The Committee's Deposition Goes Outside Its Stated Scope**.  A

deposition took place on February 24, 2004.  Contrary to the Committee's stated purpose

for the deposition to this Court both orally and by letter dated February 17, 2004, the

Committee's questions were almost entirely unrelated to the use of the Citibank Facility

to redeem some or all of the 2006 Notes.  See Rebele Deposition Transcript at pp. 55-62

attached as Exhibit 21.

On February 27, 2004, well after the close of business, the Committee

filed its instant 28 page application and 66 page memorandum of law in support of the

Motion.  G-I and BMCA have been given only 5 business days to respond.  Notably, the

Motion and Memorandum barely mention the use of the Citibank Facility to redeem the

2006 Notes or the Refinancing.  They deal entirely with the Committee's request to

prosecute an avoidance action on behalf of G-I's estate.  G-I, BMCA and this Court have

clearly been misled.

**Refusal to Produce a Witness for Deposition**.   The Committee also

refused to produce a Committee member for a deposition scheduled by G-I on March 4,

---

may seek to use the Citibank Facility to buy back some of the 2005 or 2006 Notes to
facilitate the closing.  See Exhibit 20.

2004.  The Committee attorneys pretended not to know what contested matter the notice

of deposition was issued in and asserted they had a prior right to know why G-I thought

the witness may provide relevant testimony.  <u>See</u> Exhibits 32, 33, and 34.  Having failed

to appear at a scheduled deposition even after counsel of the Committee member was

informed of its purpose (as if he hadn't known!), the Committee's Motion should be

denied on this ground alone.

C.      **RELEVANT FACTS**

**<u>BMCA's Leading Roofing Business</u>**.  BMCA is the country's leading

manufacturer of premium residential and commercial roofing products, including the

Timberline and Sovereign series roofing shingles.  The Timberline series is the leading

brand in the premium laminated residential shingle market.  BMCA's commercial

products include a full product line of modified bitumen and asphalt built-up roofing

products, liquid applied membrane systems and roofing accessories.  BMCA's Ruberoid

brand (refined over the years) is today the leading brand in the modified bitumen

commercial roofing market, the fastest growing segment of the commercial roofing

industry.

**<u>The Formation of BMCA</u>**.  The rationale for forming BMCA to purchase

the GAF roofing materials business was set forth fully at the hearing on substantive

consolidation.  BMCA was created in 1994 to afford the roofing business better access to

the capital markets.  This strategy has succeeded and as a result more value has been

generated for G-I's asbestos creditors.[3]  As Mr. Collins testified at the March 14, 2001

hearing on substantive consolidation:

> Q.     Did the separation of the BMCA business from G-I
>        Holdings Inc., predecessor GAF Corporation, to
>        your knowledge, have any impact on the subsequent
>        progress of BMCA's business?
>
> A.     Yes it did.
>
> Q.     What impact was that?
>
> A.     Well it enhanced the value of the Company a lot
>        because we were able to gain the financing, I
>        believe gain additional credibility with the vendors
>        and our customers.
>
> Q.     Why is that?
>
> A.     Because we separated then from the GAF
>        Corporation.
>
> Q.     Do you know if you could have obtained that bank
>        and bond financing if BMCA were still a division of
>        the GAF or G-I Holdings Inc.'s business?
>
> A.     I don't believe we would have.

March 14, 2001 Hearing Transcript at pages 16-17, annexed hereto as Exhibit 3.

**Securitization of BMCA's Credit Facility**.  In connection with the

Committee's substantive consolidation complaint, Mr. Collins and Ms. Yoss both

testified to the need for BMCA to secure BMCA's credit facility.  Specifically, Mr.

Collins noted the concerns raised by BMCA's vendors over the then recent Owens

Corning bankruptcy filing and the need for BMCA to obtain additional liquidity to

address these customers' concerns:

> Q.     How did the refinancing come up to begin with?

---

[3]     Prior to the Committee's substantive consolidation complaint, BMCA's creation
was never challenged.

> A.      A lot of things were triggered by that – by Owens
> Corning's filing and our – and G-I Holdings'
> notification to BMCA that they would have some
> troubles.  And that made us think we'd better be
> prepared for what happened to G-I Holdings.

Collins' Deposition Transcript at 128-129, annexed hereto as Exhibit 4.

And again, at page 133 of his deposition transcript, Mr. Collins, in

response to a question pertaining to the need for the refinancing, testified:

> Q.      What was the perceived need for that [the
> refinancing]
>
> A.      Well, the ability to take care of our vendors if
> something happened to G-I Holdings was a very
> real concern to us, as well as the liquidity strength
> that we could present to our customers in the event
> something happened to G-I Holdings.

Mr. Collins also testified at the substantive consolidation hearing as to the

benefits to BMCA of entering into the receivables financing facility:

> Q.      Did the financing and refinancing in December
> 2000, have an impact on BMCA
>
> A.      Yes.
>
> Q.      What impact was that?
>
> A.      Well, it allowed us to reassure our vendors and
> customers that we had sufficient liquidity for
> getting through any anxiety they had about where
> we might be – how we might be affected by G-I
> Holdings' filing in early January.

March 14, 2001 Hearing Transcript at pages 16-17, annexed hereto as Exhibit 3.

Ms. Yoss also testified to the same motivating factors and also noted the

company's softening business performance as another factor driving the need to enter

into the receivables financing facility:

> A.      The Company had about 100 million of payables, I
> guess, in September, and we were concerned that –

particularly in light of the Owens Corning situation the vendors would be concerned; there was a lot of misperception that there would be a run on the banks. So the significance was that we were able to have ample liquidity to be able to demonstrate to the vendors.

…

A.      Besides the Owens Corning filing, the company's business performance was softening in the third quarter, particularly due to rising raw material costs, asphalt etcetera, and we were concerned that that would require greater cash needs for the company. Also, we had a receivables – an off balance sheet receivables financing that was maturing in the fall of 2001, and with the difficult bank market, I was concerned on how to refinance that facility. I was really concerned about the liquidity of the company.

March 6, 2001 Deposition Transcript of Susan Yoss at pages 33 and 38, annexed hereto as Exhibit 22.

**BMCA's Successful Operations**. As a result of its separation from G-I, BMCA's business is thriving. Since 2000, operating income has increased by approximately $52 million, sales have gone from $1.2 billion to approximately $1.4 billion and EBITDA has also increased by approximately $58 million. See October 18, 2002 Hearing Transcript at p 105 lines 14-23 at Exhibit 23. See also, BMCA Form 10-K's for fiscal years ending 1999, 2000, 2001 and 2002 at Exhibits 24 through 27. As Mr. Collins testified at the March 2001 substantive consolidation hearing:

In the last seven years, the market share of BMCA has gone from number three to number one. We have grown our sales from about $559 million to $1.2 billion. Our operating income has grown from about $41 million up to, in 1999, about $86 million. We have made seven acquisitions. We have also built a very strong team of sales and marketing technical service folks around the industry. I would say we have the strongest team in the industry right now.

Transcript of Proceedings dated March 14, 2001, annexed hereto as Exhibit 3, at 7.  <u>See</u>
<u>also</u> Letter dated January 7, 2004 from Kathryn Turner to the Committee, annexed hereto
as Exhibit 36, containing estimates of BMCA's 2003 performance: "BMCA is currently
projecting to finish 2003 with another year of record results with net sales at
approximately $1.6 billion, up 18%, operating income at approximately $135 million, up
16%, and EBITDA at approximately $170 million, up 15%."

### <u>Negative Impact on BMCA in the Event of Consolidation or</u>

<u>Bankruptcy.</u>   Mr. Collins previously testified at the substantive consolidation hearing as
to the substantial negative impact a BMCA filing would have on BMCA and its creditors:

> Q.  If BMCA were to be consolidated with G-I Holdings, Inc. and if the
> liens you have heard about securing the banks and bonds, were avoided, is
> it clear to you that G-I's creditors would be better off?
>
> A.  No.
>
> * * *
>
> Q.  …Using the measurement stick you gave us earlier, one time sales, do
> you think applying that measurement against 1.2 billion of sales a year, the
> value of the BMCA business, if it were consolidated, would be going up
> or down?
>
> A.  It would be going down.
>
> Q.  Significantly?
>
> A.  I think significantly, yes.

Transcript of Hearing dated March 14, 2001 at pages 32-37, annexed hereto as Exhibit 3.
<u>See</u> <u>also</u> Deposition Transcript of Bill Collins dated February 27, 2001, annexed hereto as
Exhibit 4, at pp. 26-27 testifying to the negative impact substantive consolidation would
have on BMCA's business:

It would damage our customer relations.  It would damage the retention of employees.  It would damage negotiations we currently have with other alliances.  It would also affect terms that we have with vendors.  It would undermine the various marketing arrangements we currently have.  It could destroy advantages that we have in the marketplace currently and would lead to a dramatic drop in sales and operative income.

See also Deposition Transcript at page 62 annexed hereto as Exhibit 4:

Contractors will not waste their time with a company they have any risk with.  They'll change a spec to who they'll work with and that's borne out across the business.

I don't know what more facts you need then to got out and look at what happens every day.  Contractors make decisions every day as to whose product they are going to take in, and they have clear choices, and they aren't going to take on additional risks.[4]

---

[4]    See also, Deposition Transcript, annexed hereto as Exhibit 4, at 92-93:

I believe it would affect the sales of both our residential division and the commercial division, because of the perception by the contractor that he would choose – given a choice, not to use our product

…

A large portion of our business is concentrated in major distributors – a portion.  A portion of our business – major distributors will not risk the uncertainty of dealing with new people or a new direction or a discontinuation of what we've done in the past to grow their business.

And I am very – unfortunately very certain they will shift business away from us very quickly, based on just the nature of the entrepreneurs who are distributors, who aren't going to take on additional risk, and bankruptcy is an additional risk in those distributor's minds.

## ARGUMENT

**I.      The Committee Has Failed to Demonstrate the Refinancing is Not in
BMCA's Best Interests.**

This Court has repeatedly held that the preliminary injunction protecting

BMCA from asbestos claims was never intended to prevent BMCA from proceeding with

normal course transactions:

> It was never the intention of the Court in determining that conditions be
> drafted on the injunction to not allow BMCA, which is admittedly a non-
> debtor, notwithstanding the Debtor's success in obtaining a preliminary
> injunction, it was never the intent of this Court to not allow normal course
> transactions to proceed.  It appears that the types of certain of the
> conditions the Committee wished to have imposed without agreement, go
> well beyond what this Court envisioned as reasonable conditions.  So I can
> just say that right now…. So if there has been some misapprehension to
> not have normal course transactions proceed in the normal course, I know
> of no authority that would have me impose conditions that would not
> allow a non-debtor to do business.

Transcript of Hearing dated July 19, 2001, annexed hereto as Exhibit  at pp. 64-66.[5]

Accordingly, when called upon to review BMCA's transactions, this Court

has been careful to do so solely to determine if they conform with the business judgment

standard.  It has done so even when a higher standard of review has been strenuously

urged by the Committee and the Legal Representative:

> The Committee and the Legal Representative both
> ask that BMCA and the debtor be subject to a higher
> standard of scrutiny than that given the debtor's business
> judgment under *Aerovox.*
> As this Court has indicated previously, it is acutely
> aware that BMCA is not in bankruptcy and accordingly is
> not inclined to interfere with its day to day business
> decisions.

---

[5]      See also Transcript of Decision dated June 17, 2003, annexed hereto as Exhibit
17, at 25 "…it is clear that BMCA must conduct its business as usual, pay its debts as
they come due and refinance its obligations."

> On the other hand, the Court balances the fact that
> BMCA is the beneficiary of the preliminary injunction.
> However, those being the facts, this Court sees no need to
> draft Delaware Corporation law onto the already sufficient
> business judgment standard provided under the *Aerovox*
> case.  Here essentially the Court has to determine whether
> or not adequate business judgment was involved.

Transcript of Decision dated December 6, 2002, annexed hereto as Exhibit 28 at pages

40-41.  See also, Transcript of Decision dated April 2, 2003, annexed hereto as Exhibit

29, at 18 denying the Committee's request to hold BMCA to a higher standard of review

in connection with the Committee's objection to the payment of bonuses to certain

BMCA executives ("this Court determines that it will not hold BMCA to a higher

standard than that required by the business judgment rule as set forth in numerous case

law including the Aerovox case.").

The Refinancing is a prudent exercise of BMCA's good business

judgment.  As explained to the Committee at a meeting on January 26, 2004, the

benchmark Treasury Note is trading at an all-time low which, when coupled with the

current all-time low credit spreads, creates a very favorable interest rate environment.

The Refinancing will allow BMCA to improve its debt maturity profile at a time when

interest rates are near a ten year low.  The economic gain to BMCA of proceeding now

rather than waiting until December 2004 to redeem the Notes is approximately $3 million

(inclusive of the $1.4 million call provision).[6]  Redeeming the Notes, therefore, provides

---

[6]     This is because the prevailing view of the experts is interest rates will have moved
45-55 basis points by December 2004.  The January 2004 Blue Chip Financial Forecast,
which reflects the view of the top 46 financial institutions, is forecasting the fourth
quarter rate for the 10 year treasury note to be 5.10%.  Thus, a BMCA offering in
December 2004 will likely have a coupon in excess of 9.00%.

for the best and most economical opportunity to extend maturity at a time when BMCA

has $505 million coming due within the next four years.

       The Refinancing also allows BMCA to access an additional $50 million in

financing at very low interest rates which will provide it with the flexibility and ability to

make strategic purchases over the next 5 years to grow the business.  The Refinancing

has been approved by the BMCA board as being a sound exercise of business judgment

and in the best interests of BMCA.  See Rebele Deposition, annexed hereto as Exhibit 21,

at pp. 95-101.

       With respect to using the Citibank Facility to purchase some of the 2005

or 2006 Notes, Mr. Rebele testified this option was being considered to help facilitate the

closing and reduce negative carrying costs.  He also testified BMCA would never

purchase any Notes using the facility if it would put the liquidity of BMCA at risk.  See

Rebele Deposition, annexed hereto as Exhibit 21, at 96-102, 121-128.

       The Committee, however, claims use of the Citibank Facility to buy back

all of the 2006 Notes is a "highly unusual and risky use of its credit facility to facilitate

transactions with these parties at potentially great prejudice to BMCA and the estate."

Motion at ¶ 40.  The Committee clearly does not understand this commercial transaction.

If the underwriter is willing to take on the credit risk of being able to fully subscribe the

issuance, there is absolutely no risk to BMCA's estate if it purchases all of the 2006

Notes with the Citibank Facility prior to the closing because the underwriter is obligated

to pay BMCA the amount of the issuance regardless if it is undersubscribed.  See Rebele

Transcript, annexed hereto as Exhibit 21, at 95-101.  Indeed, this was the case with

BMCA's last bond issuance.

Accordingly, the Refinancing is an excellent opportunity for BMCA and a sound exercise of its business judgment which should not be disturbed.

## II.  The Committee Misrepresents the Purpose of the Preliminary Injunction

As demonstrated above, the Committee's objection to the refinancing has nothing to do with whether it is in BMCA's business judgment – it clearly is.  Instead, it is based on its conveniently mistaken assumption the Preliminary Injunction Order is intended to preserve its hypothetical avoidance actions.  Notably, the Committee does not point to any provision of the Preliminary Injunction Order or any passage in this Court's decision approving same as authority for this statement.  This is because it can't.

Contrary to the Committee's assertions, this Court has explained it granted the Preliminary Injunction Order to preserve G-I's uniform claims process, prevent the assertion of indemnity claims against G-I's estate and to avoid unduly burdening G-I's management who would be forced to defend against the asbestos claims.  See Transcript of Decision dated June 22, 2001 at Exhibit 10.  When the Committee attempted to craft provisions onto the terms of the Preliminary Injunction Order which would have given it the protections it claims it has, this Court expressly refused to grant that relief.  See Transcript of Hearing dated July 19, 2001, annexed hereto as Exhibit 12, at pp 47-48.  Instead, the Committee was only given the opportunity to receive 30 days advance notice of certain business transactions for the purpose of monitoring G-I's preservation of BMCA's business.

The Committee's premise is contradicted by the substantive consolidation hearing.  The whole purpose for that hearing was to provide the Committee with an opportunity to convince the Court BMCA should be put into bankruptcy before the

running of the 90 day preference period.  After three full days of hearing and the review

of all evidence presented, this Court denied the Committee's requested relief.  The Court

therefore knowingly allowed the 90 day period to lapse and the Committee never

appealed.

**III.    The Committee Has Not Shown It Will Be Harmed Absent the
          Requested Relief.**

Since being denied its request for interim substantive consolidation, the

Committee has continued to insist it can seek retroactive substantive consolidation of

BMCA and G-I and then avoid the liens BMCA granted to its Bondholders.  <u>See</u> Exhibit

1 at p. 16.  Nowhere in its papers does it now claim it cannot seek that relief if the Notes

are repaid.  Indeed, all the Committee's papers state is according to BNY payment might

be a defense.  The Committee itself never admits the validity of this defense.

The Committee also cites no authority showing a debt disappears once it is

repaid and ignores the jurisprudence showing avoidance actions are collectible after

payment.  <u>See</u>, e.g., <u>Goldberger v. Davis Jay Corregated Box Corp.</u> (<u>In re Mercon Indus.,</u>

<u>Inc.</u>), 37 B.R. 549, 552 (Bankr. E.D. Pa. 1984) (court holding repayment of a debt does

not moot avoidance actions);  <u>Herman Cantor Corp. v. Central Fidelity Bank, N.A.,</u> (<u>In re</u>

<u>Herman Cantor Corp.</u>), 15 B.R. 747 (Bankr. E.D.Va. 1981) (holding payment to creditor

of debtor's obligation is subject to being avoided by the trustee because the transfer may

benefit an endorser, guarantor, or surety since it discharges its contingent debt); and <u>In re</u>

<u>Aerco Metals, Inc.</u>, 60 B.R. 77 (Bankr. N.D. Tex. 1985) (same).  Accordingly, the

Committee has failed to show it will be harmed or its avoidance actions prejudiced absent

its requested relief.

**IV.**    **The Committee's Proposed Course of Action Will Materially Harm BMCA.**

In contrast, BMCA will be materially harmed if this Court grants the

Committee's requested relief.  Noticeably absent from the Committee's brief is any

consideration of the harm that would result to BMCA's business if it were successful in

achieving its requested relief.  (The Committee's cavalier attitude and lack of evidence

about the net financial and employment impact of tossing BMCA into bankruptcy and

cannot be overstated).  Mr. Collins previously testified at the substantive consolidation

hearing as to the substantial negative impact a BMCA filing would have on BMCA and

its creditors:

> Q.  If BMCA were to be consolidated with G-I Holdings, Inc. and if the
> liens you have heard about securing the banks and bonds, were avoided, is
> it clear to you that G-I's creditors would be better off?
>
> A.  No.
>
>              * * *
>
> Q.  …Using the measurement stick you gave us earlier, one time sales, do
> you think applying that measurement against 1.2 billion of sales a year, the
> value of the BMCA business, if it were consolidated, would be going up
> or down?
>
> A.  It would be going down.
>
> Q.  Significantly?
>
> A.  I think significantly, yes.

Transcript of Hearing dated March 14, 2001, annexed hereto as Exhibit 3, at pages 32-37

See also Deposition Transcript of Bill Collins dated February 27, 2001, annexed hereto as

Exhibit 4, at pp. 26-27, testifying to the negative impact substantive consolidation would

have on BMCA's business:

> It would damage our customer relations.  It would damage the retention of
> employees.  It would damage negotiations we currently have with other
> alliances.  It would also affect terms that we have with vendors.  It would
> undermine the various marketing arrangements we currently have.  It
> could destroy advantages that we have in the marketplace currently and
> would lead to a dramatic drop in sales and operative income.

See also Collins Deposition Transcript, annexed hereto as Exhibit 4, at page 62:

> Contractors will not waste their time with a company they have any risk
> with.  They'll change a spec to who they'll work with and that's borne out
> across the business.

> I don't know what more facts you need then to got out and look at what
> happens every day.  Contractors make decisions every day as to whose
> product they are going to take in, and they have clear choices, and they
> aren't going to take on additional risks.[7]

> The undisputed record before this Court also clearly establishes G-I's

creation of a separate subsidiary has enabled BMCA to thrive in the marketplace:

> Q.    Did the separation of the BMCA business from G-I Holdings Inc
> predecessor GAF Corporation, to your knowledge, have any impact on the
> subsequent progress of BMCA's business?

> A.    Yes it did.

---

[7]    See also, Collins Deposition Transcript, annexed hereto as Exhibit 4, at 92-93:

> I believe it would affect the sales of both our residential division and the
> commercial division, because of the perception by the contractor that he
> would choose – given a choice, not to use our product

> …

> A large portion of our business is concentrated in major distributors – a
> portion.  A portion of our business – major distributors will not risk the
> uncertainty of dealing with new people or a new direction or a
> discontinuation of what we've done in the past to grow their business.

> And I am very – unfortunately very certain they will shift business away
> from us very quickly, based on just the nature of the entrepreneurs who are
> distributors, who aren't going to take on additional risk, and bankruptcy is
> an additional risk in those distributor's minds.

Q.     What impact was that?

A.     Well it enhanced the value of the Company a lot because we were able to gain the financing, I believe gain additional credibility with the vendors and our customers.

Q.     Why is that?

A.     Because we separated from the GAF Corporation.

Q.     Do you know if you could have obtained the bank and bond financing if BMCA were still a division of the GAF or G-I Holdings Inc's business?

A.     I don't believe we could have.

See Transcript of Hearing dated March 14, 2001, annexed hereto as Exhibit 3, at 16-17.

The results have been stupendous.  As the evidence before this Court in

previous proceedings has established:

In the last seven years, the market share of BMCA has gone from number three to number one.  We have grown our sales from about $559 million to $1.2 billion.  Our operating income has grown from about $41 million up to, in 1999, about $86 million.  We have made seven acquisitions.  We have also built a very strong team of sales and marketing technical service folks around the industry.  I would say we have the strongest team in the industry right now.

Transcript of Proceedings dated March 14, 2001, annexed hereto as Exhibit 3, at 7.  Since

that time, BMCA's success has continued to grow.

The value-appreciation of BMCA is preserved for all G-I's constituencies,

including the legitimate asbestos claimants and G-I's shareholders because G-I owns

BMCA.  Contrary to the Committee's allegations, BMCA's growth has benefited G-I's

creditors.  The Committee's contention BMCA encumbered its assets in favor of its

creditors ignores the following: (a) BMCA's dividends go to G-I; (b) BMCA's growing

equity value belongs to G-I and (c) BMCA's creditors enabled BMCA to achieve its

current status as a leading roofing manufacturer.

The Committee's assertion (Memorandum at 28) the 2000 Securitization

was not necessary or used is belied by the facts.  Both credit lines were drawn during

2001 with the $110 million facility having borrowings of approximately $40 million.

From December 2001 (when the borrowings were repaid) until July 2003, the bank lines

were used to support stand-by letters of credit.  The facility was also drawn upon during

the entire period to support BMCA's working capital needs.  Moreover, as the testimony

of Mr. Collins established, the securitization was necessary to calm vendors' and

customers' concerns:

> Q.    How did the refinancing come up to begin with?
>
> A.    A lot of things were triggered by that – by Owens
>        Corning's filing and our – and G-I Holdings'
>        notification to BMCA that they would have some
>        troubles.  And that made us think we'd better be
>        prepared for what happened to G-I Holdings.

Collins' Deposition Transcript, annexed hereto as Exhibit 4, at 128-129.  <u>See also</u> March

14, 2001 Hearing Transcript, annexed hereto as Exhibit 3, at pages 16-17.

> Q.    Did the financing and refinancing in December
>        2000, have an impact on BMCA
>
> A.    Yes.
>
> Q.    What impact was that?
>
> A.    Well, it allowed us to reassure our vendors and
>        customers that we had sufficient liquidity for
>        getting through any anxiety they had about where
>        we might be – how we might be affected by G-I
>        Holdings' filing in early January.

And again, at page 133 of his deposition transcript, Mr. Collins, in

response to a question pertaining to the need for the refinancing, testified:

Q.   What was the perceived need for that [the refinancing]

A.   Well, the ability to take care of our vendors if something happened to G-I Holdings was a very real concern to us, as well as the liquidity strength that we could present to our customers in the event something happened to G-I Holdings.

Ms. Yoss also testified to these factors as well as to BMCA's softening business performance in response to a question concerning the need for the receivables financing facility:

A.   The Company had about 100 million of payables, I guess, in September, and we were concerned that – particularly in light of the Owens Corning situation the vendors would be concerned; there was a lot of misperception that there would be a run on the banks.  So the significance was that we were able to have ample liquidity to be able to demonstrate to the vendors.

…

A.   Besides the Owens Corning filing, the company's business performance was softening in the third quarter, particularly due to rising raw material costs, asphalt etcetera, and we were concerned that that would require greater cash needs for the company. Also, we had a receivables – an off balance sheet receivables financing that was maturing in the fall of 2001, and with the difficult bank market, I was concerned on how to refinance that facility.  I was really concerned about the liquidity of the company.

March 6, 2001 Deposition Transcript of Susan Yoss at pages 33 and 38, annexed hereto as Exhibit 22.

The Committee's chartered course of action will destroy the value BMCA has worked so hard to achieve.  If a preference action is instituted this is tantamount to stating BMCA is in bankruptcy. Vendors will no longer do business with BMCA as there is a risk payments made to them will also be clawed back.  The market share BMCA has

been steadily gaining will decline and BMCA will likely lose the Good Housekeeping

Seal of Approval.  See Deposition of William Collins, annexed hereto as Exhibit 4, at 27-

29.  BMCA's sales will decline because customers will be less likely to buy roofing with

a 30 year warranty from a company who is in bankruptcy.

## V.    The Committee Has Not Established It Has a Colorable Claim.

The Committee's requested relief is based on its ability to prevail in

having the 1994 transaction set aside as a fraudulent conveyance, to join BNY and the

Noteholders to that action under 11 U.S.C. § 550(a)(2) as mediate or immediate

transferees and on its ability to prevail in attacking the liens granted to BNY and the

Noteholders during the 2000 Securitization as voidable and recoverable transfers under

11 U.S.C. § 544(b), 547(b), 548(a), 549(a) and 550(a).  The Committee does not dispute

before it can be authorized to pursue it's requested relief it must first establish it has pled

a colorable claim.  Memorandum at 19-20.

The Committee will never be able to establish a colorable claim of fraud

with respect to the 1994 Transaction because G-I received all of the stock of BMCA in

addition to BMCA's assumption of $204 million in liabilities.  See Deposition Transcript

of Richard A. Weinberg, annexed hereto as Exhibit 30, at 111-113.[8]  As all of BMCA's

stock was transferred to G-I, it by definition received reasonably equivalent value.  The

Committee therefore misleads the Court when it claims G-I only received $204 million

from BMCA.  Memorandum at 26.  And, as demonstrated above, the transfer of the

business has allowed BMCA to grow to the benefit of G-I and its creditors.

---

[8] See also, Reorganization Agreement, Corporate Exhibit 3 to the Weinberg Deposition.

The case law is clear.  Before the Committee has standing to pursue its fraudulent conveyance action, it either has to substantively consolidate the BMCA and G-I estates or otherwise reverse pierce the corporate veil.  See Spring Grove Livestock Exch., 205 B.R. 149 (Bankr. D. Minn 1997) (holding that a representative of a bankruptcy estate of a parent has no standing to seek to avoid prepetition transfers of the property of a subsidiary unless the representative can demonstrate a credible argument to reverse the corporate veil).  See also In re Regency Holdings (Cayman) Inc., 216 B.R. 371 (Bankr. S.D.N.Y. 1998).

Moreover, since BMCA is a Delaware corporation, the Court must review the Committee's veil piercing claims in accordance with Delaware law.  Since Delaware courts are reluctant to ignore the corporate form, a party seeking to pierce the corporate veil must meet a high burden.  See Harco Nat'l Co. v. Green Farms, Inc., 1989 WL 110537 at *4 (Del. Ch. 1989).  "To state a cognizable claim for piercing the corporate veil under Delaware law, the plaintiff must allege facts that, if taken as true, demonstrate a defendant's complete domination and control over the corporation."  Northern Laminate Sales Inc v. Matthews, 249 F. Supp 2d 130 (D.N.H. 2003) (citing Wallace v. Wood, 752 A.2d 1175, 1183 (Del Ch. 1999).  The requisite degree of control requires such total domination and control, to the point where the corporation no longer has any legal independent significance of its own.  Id.  It is not sufficient for the Committee to make conclusory allegations to support its contentions.  See e.g. In re Sunbeam, 284 B.R. 355, 365-66.

The Committee's argument it merely needs to show it has made a request for substantive consolidation for the purposes of piercing the corporate veil to meet the

colorable claim test is patently false and the cases it cites as support for this assertion

stand for the exact opposite.  (See Memorandum at 37 "Thus, the clear implication of

Regency Holdings is that a *request* for substantive consolidation *seeking* to pierce the

veil, will defeat a facial challenge to standing when a parent debtor or its estate

representative sues to avoid a transfer made by a parent's subsidiary.  Securities Investor

Protection v. Stratton Oakmont, Inc….confirms the point.").

In Regency Holdings, 216 B.R. 371 the bankruptcy court held a debtor-

parent's control over its subsidiary did not, without more, permit it to recover for the

benefit of its own creditors, preferential or fraudulent transfers of its subsidiary's assets.

The court found before being able to seek such a recovery the debtor must first set forth a

prima facie case that it holds an interest in the funds paid by its subsidiary.  The Court

specifically rejected an argument by the estate representative it should be able to pursue

the claims due to its control over its subsidiary, finding, "[a]s a rule, parent and

subsidiary corporations are separate entities, having separate assets and liabilities."  Id at

375.  The Court reiterated the presumption that the parent's ownership of all of the shares

of the subsidiary does not make the subsidiary's assets the parents.  Id. (citing In re Beck

Indus., Inc., 479 F.2d 410, 415-16 (2d Cir) cert denied 414 U.S. 858 (1973).  The court

also went on to find "the creditors of the subsidiary … hold the superior claim to its

assets and a parent's de facto control does not mean it can legitimately use the

subsidiary's assets to pay its own creditors…The parent should be the last, not the first, to

realize the benefit of recovering the subsidiary's transfer." Id at 376.

In Securities Investor Protection Comp. v. Stratton Oakmont, Inc., 234

B.R. 293 (Bankr. S.D.N.Y. 1999) the court required the trustee to plead sufficient facts to

meet the 10 factor test established by the Second Circuit in <u>Wm Passalacqua Buildings</u> <u>Inc. v. Resnick Developers South, Inc</u>., 933 F.2d 131 (2d Cir. 1991) before holding the trustee had satisfied the burden of proof at the pleading stage.  The necessary factors required to be shown included: (i) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like; (ii) inadequate capitalization; (iii) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (iv) overlap in ownership, officers, directors and personnel; (v) common office space, address and telephone numbers of corporate entities; (vi) the amount of business discretion displayed by the allegedly dominated corporation; (vii) whether the related corporation dealt with the dominated corporation at arms length; (viii) whether the corporations are treated as independent profit centers; (ix) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (x) whether the corporation in question has property that was used by other corporations as if it were their own.  <u>Id</u> at 322.

Significantly, the trustee in <u>Stratton Oakmont</u> was attempting to recover money the DEBTOR paid to satisfy its parent's contractual liability.

Only after finding the trustee had alleged <u>many</u> <u>more</u> factors than required under <u>Passalacqua</u>, did the court find the trustee's reverse veil piercing theory could survive the pleading stage.  <u>Id</u> at 323.  In contrast to this case, the only factors cited by the Committee to make out its case are (i) Sam Heyman owns BMCA and G-I; (ii) G-I transferred its operating assets to BMCA; (iii) BMCA assumed liability for the first $204 million of GAF's asbestos claims; (iv) BMCA has upstreamed $265 million to its parent

in the form of dividends; (v) G-I is a holding company with no operations of its own; and

(vi) some of the individuals who participated in the 1994 Transaction were involved in

the 2000 Securitization.  Whether taken in conjunction or alone, these factors do not

establish the corporate form has been disregarded.  Moreover, these are the identical facts

raised to the Court at the substantive consolidation hearing which this Court found were

insufficient to grant the requested relief.  See Transcript of Decision at Exhibit 31.  Thus,

the Securities Investors case supports denial of the Committee's Motion.

     In re Beck Indus Inc., 479 F.2d 410 (2d Cir. 1973) also cited by the

Committee supports denial of the Committee's Motion.  In Beck, the Second Circuit held

unless the moving party is able to demonstrate a subsidiary is an alter-ego of the debtor-

parent, the assets of the subsidiary are not property of the estate.  Id at 416.  The burden

of proof is on the moving party to establish sufficient facts.  Id. at 417.  Especially

noteworthy is the court's finding the burden of proof is not sustained when a subsidiary

operates as a viable, independent going commercial concern, as BMCA does.  Other

relevant indicia relied upon by the Court to find the subsidiary in that case was distinct

from its parent were: (i) the subsidiary traded in its own name; (ii) the subsidiary held

itself out to the general public and trade creditors as a business separate and distinct from

its parent; (iii) there was no commingling of assets; (iv) the subsidiary was sufficiently

capitalized; and (v) the subsidiary conducted its affairs as a separate and independent

corporate entity.  The identical factors exist here.  G-I and BMCA have separate books

and records, operate under their own names and hold themselves out as separate entities.

See Transcript of Decision dated March 21, 2001 at Exhibit 31.

Similarly, in <u>FDIC v. First Interstate Bank of Denver N.A.</u>, 937 F. Supp

1461 (D. Colo 1996), the court only sustained a piercing the corporate veil suit after well

pleaded and supported allegations sufficient to sustain a piercing the corporate veil suit

had been established.  Plaintiff had demonstrated, among other things, that (i) the entities

in question did not observe corporate formalities of shareholder or board meetings; (ii)

the entities transferred at their discretion and without notice, between accounts

maintained at those affiliates, money, securities, commodities and other property

belonging to other entities; (iii) officers of one entity would set the compensation of

senior managers at other entities; and (iv) an officer of one entity was able to suspend

trading in any client account of another entity, although that officer did not hold any

management position with the entity.  <u>Id.</u> at 1467.  None of these facts exist here nor has

the Committee claimed to the contrary.  <u>See</u> Transcript of Decision dated March 21,

2001.

Indeed, we have not been able to find a single case (nor has the Committee

cited one) which stands for the proposition the mere assertion of a substantive

consolidation complaint for the purposes of piercing the corporate veil is sufficient to

institute avoidance actions against a non-debtor subsidiary.  Having failed to find any

case law on point the Committee resorts to distorting the facts and misleading the Court

with respect to their actual holdings.

It must also be remembered this Court has already reviewed these very

same facts and found the Committee had failed to set forth a <u>prima</u> <u>facie</u> case.  <u>See</u>

Exhibit 30.  Having failed to assert any new facts, the Committee's claim must fail.

If the Committee feels it is prejudiced by actually having to establish its claim, it has only itself to blame. The Committee never appealed this Court's decision denying its request for interim substantive consolidation nor did it pursue that action despite G-I's repeated requests for it to do so. Even when G-I threatened to file a motion for summary judgment with respect to the Committee's substantive consolidation complaint, the Committee still wouldn't move forward and instead argued the action was stayed pending the District Court's determination of the Declaratory Judgment Action. G-I disagreed. See Transcript of Proceedings dated September 30, 2003, annexed hereto as Exhibit 2, at 109-112.

The Committee has also delayed resolution of the Declaratory Judgment Action. This action was brought by G-I immediately after commencing its case in the Bankruptcy Court. The Committee refused to answer G-I's complaint on the ground judicial economy required it to wait for the appointment of a legal representative for G-I's estate. See Transcript of Proceedings dated July 19, 2001, annexed hereto as Exhibit 12, at 30 and 35.[9] Once the Legal Representative was appointed, the action should have proceeded. It didn't. Instead, the Committee moved to withdraw the reference claiming the action had to be heard by the District Court (presumably after losing its request for interim substantive consolidation in this Court, the Committee sought a more favorable forum in the District Court). Once withdrawn, G-I wanted to move forward expeditiously with a summary judgment motion. The Committee resisted, claiming

---

[9]       "I've given Mr. Swett the proposal I read to the Court. The frustration on the Debtor's part is that we wanted to go forward with the adversary proceeding and they said "let's wait for a legal representative." (Statement of Mr. Bienenstock, Transcript of Proceedings dated July 19, 2001, annexed hereto as Exhibit 12, at 30)

extensive discovery was required.  The action is now bogged down in the Committee's

discovery requests.  Over 300,000 pages of documents have been produced, 19

depositions held and $5 million in legal fees expended by the Committee and the Legal

Representative alone.  Despite this, the Committee has still failed to uncover a single fact

that supports its case for successor liability.[10]

Even if the Committee were somehow able to make out its claim for

substantive consolidation for the purpose of piercing the corporate veil, it still cannot

succeed because (as it even admits) the statute of limitations to bring an avoidance action

for the 1994 Transaction has long since expired.  The 1994 Transaction was publicly and

widely disclosed and therefore there is no basis upon which to grant an equitable tolling

of the statute of limitations.  The Committee cannot avoid this fact by simply stating this

Court should only consider this issue once its action is underway.  Motion at ¶ 33.

Section 550(a) does not assist the Committee in establishing standing to

bring an action against BNY or the Noteholders.  That section provides, to the extent a

transfer is avoided under 544, 545, 547, 548, 549, 553(b) or 724(a) of the Bankruptcy

Code, the trustee may recover the property transferred or the value of the property

transferred from an initial or any subsequent transferee.  Until the Committee can plead

facts sufficient to pierce the corporate veil for the actions listed above, its claims against

BNY and the Noteholders are not ripe.  See Reno v. Catholic Social Services Inc., 509

---

[10]     It must also not be forgotten this is the Committee's third attempt to throw BMCA
into bankruptcy for the purposes of prosecuting an avoidance action.  The first two times
(interim substantive consolidation and the motion to appoint a chapter 11 trustee) the
Committee failed to establish a prima facie case.

U.S. 43, 72 (1993) (quoting <u>Thomas v. Union Carbide Agr. Prod Co.</u>, 473 U.S. 568, 580-81 (1986)).

 Finally, Bankruptcy Code section 550(b) prevents the Committee from proceeding against BNY or the Noteholders.  Section 550(b) provides:

> (b) The trustee may not recover under subsection (a)(2) of this section from –
>
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
>
> (2) any immediate or mediate good faith transferee of such transferee.

## VI. This Court Lacks Jurisdiction to Implement the Committee's Requested Relief

 Both this Court and the District Court have held they lack jurisdiction to prevent BMCA, a non-debtor, from repaying its obligations:

> So if there has been some misapprehension to not have normal course transactions proceed in the normal course, *I know of no authority that would not allow a non-debtor to do business*.
>
> There were other reasons why I imposed the injunction and I hope they are articulated in the reasoning of my opinion, which I don't intend to comment upon or reiterate, nor – and I understand that was imposed over objection of the Committee.  But, in terms of repayment of debt that would normally be repaid, I assume that – I would be hard pressed to stop the repayment of normal debt obligations.  That wasn't ever meant to be an outcome of this injunction proceeding or any conditions pertinent thereto.  Certainly, information should be provided.  But, BMCA has to be able to operate as an ongoing business.  We are not talking about insider transactions or transactions that are generally given greater scrutiny and are suspect, but we are talking about transactions between an arms length party, and subject to reporting requirements of a public company.  Let's put it in proper context because I was never intending to put those kind of scriptures on a non-debtor public company.[11]

---

[11] Indeed, the Committee argued that BMCA should not be allowed to repay any of its debt obligations and this was expressly denied by the Court.  "We are proposing the

Transcript of Proceedings dated July 19, 2001, annexed hereto as Exhibit 12, at 65-66 (emphasis added).  See also District Court Decision, dated January 29, 2004, annexed hereto as Exhibit 18, at 16 ("I don't know how the Bankruptcy Court would have had the authority to restrict BMCA from going ahead with the refinancing with Citibank.  And it if didn't have the authority to do that, then I don't know how it has authority to impose a condition that  -- as a condition to BMCA entering into that, BNY had to give up whatever defenses it might have resulting legally from the payment of the balance of the loan.")[12]

Both Courts have also held they lack subject matter jurisdiction to interfere with the avoidance actions the Committee seeks to institute against BNY and the Noteholders on the ground they are not ripe for judicial review.  Specifically, in connection with the 2003 Refinancing this Court held:

> In the instant case, because the preference and avoidance actions that the Committee might assert would require intervening actions, this Court cannot find sufficient subject matter jurisdiction to presently consider the Committee's requests as outlined in the order modifying the preliminary injunction.
>
> …
>
> Put in other terms, the resolution of the debtor, Committee, Legal Representative, Bank of New York and noteholders' rights as to these future proceedings is not yet ripe.

---

construct that the old money has to stay in place unless you say it can be repaid, so that we won't completely moot out the issue that we have before you in the substantive consolidation case which is lien avoidance."  See Transcript of Proceedings dated July 19, 2001, annexed hereto as Exhibit 12, at 48.

[12]    See also page 18 "But I mean, if BMCA had been able to pay off the BNY bank out of its own funds, the Bankruptcy Court couldn't say, hey, wait a minute, we don't want you to do that."

Transcript of Decision dated January 29, 2004, annexed hereto as Exhibit 18, at 22-23.

       The District Court affirmed this Court's decision finding the controversy

too remote for judicial review:

> As BNY argues, before the Committee can even bring an action against
> BNY seeking to avoid the liens given by BMCA in December 2000, the
> following uncertain and contingent events would first have to occur: (1)
> the Committee must prevail in the Successor Liability Action and establish
> that BMCA is liable for G-I's asbestos liabilities; (2) BMCA must file for
> bankruptcy relief; then (3) the Committee must succeed in getting the
> resultant BMCA estate substantively consolidated with the G-I estate and
> finally (4) the Committee must successfully make the substantive
> consolidation retroactive to the January 5, 2001 Petition Date.  As BNY
> points out, such speculative future "claim" which does not now exist and
> may never exist, does not even belong to G-I or its creditors because its
> related to liens granted by BMCA rather than G-I.  The Committee does
> not dispute or otherwise address the fact that these contingent events
> would need to occur before it could file an avoidance claim against BNY
> or that such events may not ever occur.  Accordingly, while a court does
> generally have the power to modify its own preliminary injunction, the
> relief sought by the Committee presents a controversy too remote for
> judicial review.

District Court Decision dated January 29, 2004, annexed hereto as Exhibit 18, at 20.

       In an attempt to manufacture ripeness for the current Motion, the

Committee is requesting it be appointed for G-I to file and prosecute a fraudulent

conveyance action against BMCA for a ten year old, well publicized transaction.  It will

then join BNY and the Noteholders as mediate or immediate transferees.  As explained

above, before the Committee can bring an action to avoid the 1994 Transaction, it must

first pierce the corporate veil.  This Court has previously denied the Committee this relief

and the Committee has failed to assert any new facts, despite four years of discovery and

generating over $5 million in legal fees.  Until it is able to do so, the actions it seeks to

commence against BNY and the Noteholders are not ripe, pursuant to this Court and the

District Court's own decisions.

The relief requested by the Committee must also be denied on the ground

it seeks a provisional remedy.  Namely, just in case the Committee's constituency is one

day deemed to have claims against BMCA, the Committee wants BMCA's assets

submitted now to the Court's jurisdiction.  Grupo Mexicano v. Alliance Bond Fund, 527

U.S. 308 (1999) holds the relief requested by the Committee falls outside this Court's

jurisdiction.

In  Grupo Mexicano, the United States Supreme Court held federal courts

do not have authority to grant provisional remedies to creditors who have not received

judgments against a debtor. There, a Mexican company subject to jurisdiction in the

United States announced it planned to use valuable notes it was about to receive from the

Mexican government to pay off Mexican creditors, leaving nothing for American

creditors.  527 U.S. at 311-12.  Notably, no one disputed that the Mexican company owed

money to the American creditors. The American creditors filed suit with the United

States District Court requesting breach of contract damages and a preliminary injunction

restraining the Mexican debtor from transferring its right to the notes to its Mexican

creditors.  Recognizing the American creditors predicament, the District Court granted a

preliminary injunction enjoining the petitioner from transferring its right to the notes.

The Second Circuit affirmed.  The United States Supreme Court reversed the judgment.

Justice Scalia, writing for the majority, held the District Court lacked authority to issue a

preliminary injunction preventing the Mexican company from disposing of its assets

pending adjudication of the Americans' contract claims for money damages because such

a remedy was historically unavailable from England's High Court of Chancery when the

United States separated from England.  527 U.S. at 318-320.  The Supreme Court ruled:

"[e]ven when sitting as a court in equity, we have no authority to craft a 'nuclear weapon'

of the law like the one advocated here." <u>Id.</u>, at 332.

Based on the Supreme Court's holding in <u>Grupo Mexicano</u>, this Court

lacks authority to grant the Committee's request prior to its ability to substantively

consolidate BMCA and G-I for the purposes of piercing the corporate veil.

**VII.    The Committee Has Failed to Demonstrate Its Appointment as Estate Representative is Warranted.**

        For the reasons stated above, the Committee's requests for authority to prosecute avoidance actions should be denied on the papers as it cannot show it has a colorable claim or  G-I unjustifiably refused to bring its actions.  Cybergenics II, 330 F.3d at 561 (citing Fogel v. Zell, 221 F.3d 955, 965-66 (7th Cir. 2000)).  See also, In re America's Hobby Center Inc., 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) citing, In re STN Enterprises, 779 F.2d 901 at 905.

**CONCLUSION**

        Based on the foregoing, the Committee's Motion should be denied and BMCA should not be barred from entry into the Refinancing transaction.

Dated:      Morristown, New Jersey
              March 7, 2004

                      By:    /s/ Dennis J. O'Grady
                         Dennis J. O'Grady (DJO 7430)
                         RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
                         Co-Attorneys for the Debtors
                         Headquarters Plaza
                         One Speedwell Avenue
                         Morristown, New Jersey 07962
                         Telephone:  (973) 538-0800

                         -and-

                         Martin J. Bienenstock, Esq. (MJB 3001)
                         Kathryn L. Turner, Esq. (KLT 8555)
                         WEIL, GOTSHAL & MANGES LLP
                         Co-Attorneys for the Debtors
                         767 Fifth Avenue
                         New York, New York 10153
                         Telephone:  (212) 310-8000